Clerk, please call the next case. 324-0676. George Hidalgo, appellant by Marios Karyanis, v. Village of Romeoville, appellee by Michael Grishan. Counsel Karyanis, you may proceed. Thank you, Your Honor. May it please the Court, Mr. Grishan, Defense Counsel. My name is Marios Karyanis. I represent the plaintiff appellant in this case, Mr. Hidalgo. As the Court is well aware, we're here today following the granting of a summary judgment by the trial court. The Court's review of this matter is obviously therefore de novo. The first question I think the Court needs to address in its decision here is the question of, is RFA, Romeoville Fire Academy, actually a governmental body that should be afforded tort immunity? This is kind of an unusual fact pattern and an unusual case. As indicated in the records, the Academy was set up by the Village of Romeoville. The very documents setting up the Academy and the discussions that were had at the time that the Academy was set up addressed the fact that this entity, if you will, was going to be effectively a for-profit enterprise. In setting up the entity, addressed the fact that all the tuition would pay for everything that was going on. No public funds would be used. It was a not-for-profit though, right? It was a corporate company? It's actually not really an entity, to be honest with you. So in regards to the Justice's question, it's sort of an arm of the Village, but it doesn't actually exist separately in and of itself. They just call it the Fire Academy, so there's not a separate corporate entity. So I don't know that I can answer that question. Almost like a DBA. Right. So what's telling here, however, is the students in George's class, none of them were Romeoville Fire personnel. They were all outside people. None of the students would have ever performed any duties or any actions on behalf of Romeoville citizens. So effectively, this is a school run by effectively the city as a DBA for outside people that is making a profit for the Village. And the question then becomes, under the cases that we've cited, should the Village be afforded port immunity? Because is the function here a governmental function? And that's a significant question because if, in fact, the court agrees with our position that RFA should not be treated as a governmental body, then you don't need to even address port immunity. The appellee argues that the waiver that George signed negates negligence, but also correctly notes in its brief that a waiver cannot ever negate willful and wanton. That's inappropriate. And it's an interesting thing that that waiver even exists. Presumably, when the Village decided to have a waiver signed by people, it was well aware of the fact that it was afforded port immunity for the acts of its employees. And therefore, why would you draft a piece of paper that's a waiver that would potentially negate negligence if you were a governmental body afforded port immunity rights? By definition, negligence would never be an issue that you as a governmental body would have to ever face. And I'd ask the court to ask itself, as you examine the record in this case, does it make sense to have a liability waiver if you're not worried about negligence because you're a governmental body? Again, that to me suggests strongly and is another reason why this court should determine that the body, in fact, should not be afforded port immunity. Now, if you disagree with me, and we now get to the discretionary immunity discussion, governmental bodies, of course, are afforded a fairly strong protection. They have the benefit of the Port Immunity Act, which allows them to avoid liability unless their employees are willful and wanton in their conduct. There is, however, this further level of protection, and that's the discretionary immunity clause under Section 201 of the Port Immunity Act, which is an absolute bar. Once you get to that, even if you're willful and wanton, I suppose even if you're intentionally wrongdoing, you're immunized. And the Heronet case and the cases that have followed that, in my reading of the cases, involves scenarios where the person or the act in question was made or done by a decision-maker who had policy-making and policy decision-making abilities. Well, as a plaintiff's attorney, I certainly don't like the fact that those decision-makers can be given absolute immunity in these cases. Again, the statute says what it says, and so I have to live with that. The question in this case, however, is, it's my contention that RFA is asking this court to take discretionary immunity under Section 201 of the act to a hypercharged level compared to what Heronet and all the other cases that followed Heronet did. They're asking the court, and they asked the trial court, too, to effectively immunize every decision or every act made by a public employee, sort of without regard for whether that public employee has decision-making or policy-making power. In this case, Jake Hoffman, a self-described gopher, he used that word, not I, clipped George's belt, clipped the D-ring on George's belt to the wrong ring. What is the decision-making decision or policy decision that Mr. Hoffman made when he made that mistake? If we're going to immunize that act, what we are basically saying is, was it RFA's policy at that point to, let's try doing this bill by using the belt in a fashion in which it's not intended to be used? That's absurd. That wasn't a decision. Sounds like negligence, though, doesn't it, counsel? Well, I think when you look at all of the things in totality, there are so many acts that led to this fall that it's our position that all combined, they show nother indifference. I do think, however, in direct answer to the Justice's question, it's pretty clear Mr. Hoffman had no clue how to use this belt, is that you shouldn't have used the belt in this fashion. The belt manufacturer who's testified said you can't use the belt in this fashion. It's my position, and I think George deserves an opportunity to at least make this argument to a jury someday, that when that belt is the only safety device that he was afforded that day, the people running the drill and attaching him to it should know how that belt should be used. And not knowing how to do that and knowing that you're suspending a guy out of a window 35 feet does, in my opinion, show an utter indifference for George's health and safety. And unfortunately, that decision amongst many others is what led to George having catastrophic injuries here. It just seems that there's a difficult position to say that they, they're saying they chose to run the drill that way, but you're saying that they negligently or in a willful way decided to use that belt in particular the wrong way. Well, I would challenge the court to examine as you think about that is, is are we really saying for RFA that we chose to run the drill in an unsafe way and we chose to? That seems to be what they're saying. I think so, and I think the question then becomes is that what the law in Illinois should be? If a police officer chooses to drive down the streets of Ottawa at 120 miles an hour to chase a, you know, jaywalker, is that going to be afforded absolute discretionary immunity, or is that something that should be, you know, afforded tort immunity because that officer has that right? But at least let the plaintiff in that scenario have his day in court and try to convince 12 people that that's willful and one. 201. Mr. Karyanis, let me ask you to expand upon what you just said a few moments ago, which was that beyond the decision to clip it to the wrong ring, it was a series of decisions you said that led to that. Do you want to expand upon that argument, the series of decisions that you felt all culminated in this catastrophic event? Well, there's two decisions as to the belt itself. Number one, Mr. Willis clipped the line that's supposed to hold the weight to a ring that moves, which is absurd. And number two, Mr. Hoffman clipped the belay line that should have protected Mr. Hidalgo to the actual correct D ring. What about the training that would have been offered to the individual to know the correct, what's the village's position with regard to lack of training or a series of decisions that led to this? Well, if you listen to Mr. Kalaga, who wrote the drill, so to speak, they were supposed to have actual training to show them how to do the drill plus some classroom training, none of which happened. So those are decisions. And again, they're not policy decisions. They're actually not doing what Mr. Kalaga told them to do. So they're not following Romeo Bill's own policy. Now, Mr. Kalaga's decisions in setting up the drill, and that's how he set it up, that would be kind of a tough one for me to argue that Section 201 doesn't apply to those kind of decisions, to the extent that he followed the NFPA correctly. But, you know, one of the major decisions, of course, was the decision of Mr. Hardin, the lead instructor that day, to discontinue the use of the Class III harnesses. Now, that decision was made not because of a deliberative process where he, you know, decided that from a cost-benefit analysis it made more sense to, you know, not use those, whatever. He did it to speed up the drill. And it's clear as day that that's what he did. He actually, in his testimony, conceded he didn't have policy-making power for the village. And Chief Pemble, who is the person running the academy, told us in his deposition that none of these instructors had the ability to enact policy for the village. And that is what, again, I urge the Court to look at closely, is are a phase asking this Court to way go beyond what Haranek and the cases in it, you know, the cases that followed it, have indicated. So the decisions in answer to the question are the decision to take away the Class III harness, which clearly would have prevented this fall. The decision to not do the training that was adequate. The decision to not demonstrate the drill to the trainees so they'd have an idea as to how it was to be. The decision to utilize a belt that they were not familiar with. Because if they were familiar with this belt, it kind of defies logic that you would misuse the belt as badly as they did. The decision to use the wrong D-rings. There's a number of things here. And so unlike a lot of the cases that the defendant relies upon, where it's kind of one decision. You know, we're going to do the woodworking class and take off the device. We're going to do the taser class the way that guy discussed it. We're going to do the fire drill the way that Fire Marshal and Haranek discussed it. We're going to do the gymnastics class the way the PE instructor discussed it. And I think those cases I talked about at the beginning and end of that discussion are also telling. Because I'm not suggesting to the court that the individual or the decisions being made have to be made by some higher being. I mean, you know, generally a lot of the cases are it is the principal, it is a mayor, it is somebody that's at the top of the food chain. But a shop teacher and a gymnastics coach can actually make those policy decisions, too. And if you look at those cases, what I think is different about those cases than this case is, in those cases those people were running the class, the activity. And so the gymnastics instructor was making a decision as to how to run that class. You know, he's not the chief of the park department or whatever, but he's making a decision on how to run the class. He's making, he's thinking about, he's deliberating, he's making decisions as to what's safe for the students and so forth. And then doing the best he can. And in that scenario, yeah, he gets afforded the 201 immunity. That's not what Wills was doing here. That's not what Hardin was doing here. That's not what Hoffman was doing here. They weren't making those decisions. And so it is our position that RFA is asking the court to go far beyond what Aaron against Progeny have said the law is. It's a dangerous precedent because, again, if every action by every public employee was given absolute immunity, think about what that means. I see my time's about up. I tend to like to shut up when I get that. No, you can continue on. No, I get it. You're in the intersection. You're fine. Okay. So, you know, those are the major issues. Because I am short on time, I do think the facts before this case do provide a basis upon which a jury of 12 could find the Wilf and Lawton conduct. And I appreciate the Justice's comments about could it be negligence from Wilf and Lawton. Yeah, there's a super good argument that defense can make that it's the former and not the latter. But I think that George does deserve a chance to project to a jury his position and have his day in court on these facts before the court. Could a jury find that Wilf and Lawton occurred given the confluence of all the facts that occurred here? It's our position that there is sufficient evidence in the record to provide that. And so the trial court's decision, frankly, is kind of unclear as to what the trial court decided this case upon. Again, it's not clear. You know, we're just, yeah, they're all immunized and that's that basically. But respectfully, I would ask this court to reverse the trial court and then remand the case for trial. Any questions? No. I have a few. If you'll give me a moment, I want to allow the other side to respond to the same question. The belt that you're talking about. This is a drill that we're teaching firefighters how to get out of a dangerous situation with what they have on them, last resort type thing. The belt that you're talking about, I was confused as to is that something that they would always wear or is that just something they wore for this particular drill? Firefighters generally wear these belts. Each department, I believe, is different and they give different types of belts. Some actually, I think, testify that it's sewn into their gear. Generally speaking, my understanding is that the firefighters tend to wear these belts to kind of carry their gloves, carry a flashlight, whatever. And then in exactly the type of emergency you've described, they can. So we can throw that pike in the window well and rappel off. Right. In a dangerous situation. Right. And we wouldn't have the shoulder and leg harness at that time. But, of course, one would argue that that might be the safest way to practice. Right. In the real world, you never have that harness available. But in the real world, you're about to die. And so you're going to go out the window and you're going to get out. In a training world, it's our position that recognizing the trainees are, by definition, people that don't know what they're doing quite as well. It seems to lend itself to the fact that utilizing the Class 3 harnesses, our expert says you should, is appropriate. And was there anything in the record that showed any benefit to not using that safer secondary harness? Some of the RFA employees tried to suggest that it gives you a better sense of how the drill would be in real life by not having the harness. And our expert said he didn't agree with that. Again, I think if you use a deliberative process of risk-reward that you're supposed to use for discretionary immunity, I guess the risk of falling out a window and being hurt really bad versus the reward of having a little different sensation, I guess is something that somebody could examine. At the end of the day, I don't get the sense, and I'll candor, Your Honor, that this is something that really ever happens in life. This is one of those training incidents that sometimes the training is more dangerous than the actual real life event. Thank you, Counsel. Thank you. Any further questions? Thank you, Counsel. You have time to reply. Mr. Bersani, you may respond. Good morning. Good morning. May it please the Court, Counsel. My name is Mike Bersani. I represent the Appalachian Village of Romeoville in this case. Your Honor, the core issue in this case is whether the village is entitled to immunity for decisions made in planning and conducting a fire service. Can you speak up a little? Sure. These mics are primarily for recording. Sure. A fire service training drill. I mean, that's the core issue, whether immunity applies. If you decide that immunity exists in this case, there's no reason to go to the other issues as to whether it was a Wolfram One. Immunity under the Tort Immunity Act in this instance would be absolute. It covers both negligence and Wolfram One. It's a two-step process, though, isn't it, Counsel? That is correct, yeah. It asks, first of all, the nature of the position held by the decision maker or makers. In other words, was that decision, did that person occupy a position of discretion where they could exercise discretion, or did that person occupy a position of policy? So that's the first inquiry. The second inquiry goes to the nature of the activity, right? So that would be whether the employee exercised discretion and determined policy in making that decision. So there's a two-pronged test under that immunity provision. Counsel, I'm having difficulty trying to figure out how this is an exercise of discretion when it seems to be an exercise of expediency. If it was okay to do the drill one way in the morning, why was it changed in the afternoon? Sure. So the lead instructor for this program, so the bailout drill was part of an overall program. So the lead instructor for the program was a man named Brian Kulaga. And Kulaga was the one that organized and planned the whole course, as well as this drill. And he put it in writing. He sketched out in writing what the drill should be. He testified in his deposition. Actually, he was the coach twice. And he testified in his deposition that there was no statute or other legal authority that mandated how this training should be planned and conducted. There's nothing in the law that constrained or limited his discretion or his authority in how we would plan this type of drill. So it was entirely up to his personal deliberation, his personal judgment. And what he testified to was that he not only used his own personal experience as a certified fire instructor, but also his own research into bailout drills and how you conduct these drills as safely as you can. He also testified as to the policy determinations he made. And he considered safety, obviously, balance the safety of the trainees as they go through this drill. He considered the industry guidelines, which was the NFPA-recommended guideline for conducting a self-rescue or a bailout drill. He considered the efficiency of the drill, how can we do this in the most efficient manner. I think, Your Honor, it's... I'm sorry to be impatient, Counselor, but I... No. But... It's not... Are you going to argue that the way it was performed was within his guidelines that he developed? Yes. Yes, within the guidelines that he developed after considering all those... But those guidelines were different from the morning to the afternoon. I'm sorry, Your Honor? The guidelines that he chose to utilize were different from the morning exercise to the afternoon? No, not entirely. What he testified to was that... At all? At all, were they? When you say not entirely, were any of them different? And which ones were different? The morning session, the instructor in the tower allowed trainees to don the pre-sewn Class 3 harnesses, which is basically the shoulder and the torso, in addition to the Class 1 harness, which is the waist belt. So in that sense, yes, it was different. What Kalaga testified to in his deposition was that he set the minimum standard, effectively, the minimum type of equipment that could be utilized, which would be the Class 1 harness, because that's what was recommended by NFPA in terms of being the safe type of harness to use for this drill. And what he testified to was that if the instructors on the ground wanted to exceed that, go beyond that, they could. And so in this particular instance, the instructor, which was Willis, decided to do that that morning. If the trainees wanted to utilize the Class 3 harness in addition to the waist belt, they could do that. Excuse me, when you said when the trainees wanted to utilize, so it was up to the trainees to decide whether they wanted to utilize it or not in the morning.  Not the instructor. And not the instructor. So the instructor on the ground that morning gave that option to the trainees. If you wanted to don, you've got Class 3 harnesses that are available. If you wanted to don those harnesses in addition to the waist belt, you could do that. Was that same option offered then to the trainees in the afternoon session? In the afternoon session, that's when the designated lead instructor for that day, a man named Pat Harden, was alerted to the fact that the bailout drill was going very slowly. But that's not my question. My question was were the trainees given the option to utilize the belt in the afternoon? Yes, they were. Although the lead instructor for that day told the assistant instructors that they didn't have to utilize the Class 3 harnesses for the afternoon class. They didn't have to. That the Class 1 harness, which is the harness, the waist belt, was all that was minimally required for this particular drill. There is no statute or law in Illinois that mandates how, really, frankly, probably most training is conducted. But particularly in this case here. Again, you're drifting off. I apologize, Your Honor. Speak up. There is no statute or law in Illinois that mandates how a bailout drill should be planned or conducted. Not at all. And that's really the litmus test for discretionary immunity. Is there something with legal authority that somehow limits or constrains the instructor's discretion as they conduct this drill? And there isn't any. This is very similar to the Chavez v. Village of Kirkland case that involved a TASER instructor who was conducting TASER training, who was given the discretion to develop this class. And a lot of decisions were made by that instructor, including where to place the alligator clips on the trainee. The alligator clips would be connected to the probes of the TASER and, therefore, deliver the shock to the trainee so the trainee understood and appreciated what it's like to be TASED. Very similar situation here with the discretion that was permitted to the instructors to decide where on the belt to attach the rope safety system. And so the instructors on the ground attached the main line, which is the line that's connected and anchored inside the building, to the front of the belt, to the D-ring on the front of the belt. And that makes sense. That was the discretion they exercised because that's the loading or the weight-bearing D-ring. And then the belay line, which is the safety line, is attached to a D-ring on the back of the belt. So that's the discretion that the instructors exercised that morning. And they did that, and it's very similar to the Chavez case. And the Second District Court of Appeals held in that case that that decision of where to put the alligator clips on the trainee in the TASER training was discretionary and, therefore, immune from liability under Section 2-201 of the Tort Immunity Act. Same logic applies here. There's nothing that constrained or limited those instructors in where they connected or attached the main line and the belay line to the belt. They did it based upon, obviously, balancing safety and what's the safe place to put it. Secondly, what's the convenient place to put it and what's the effective place to put it. Those are all policy determinations. The efficient and convenient place to put it, the main line would be in the front and the belay line in the back. And that's the discretion that they exercised here. Counsel, if I could turn your attention to just the overall immunity. I think firefighters are kind of famous for having jobs other than being firefighters. If they wanted to open up a construction company and they told the city fathers that this would be a good idea, that they could make some money for the city, they wouldn't be granted immunity, would they? If it was a private business run completely by the firefighters? No. Gary, you honestly couldn't tell me what kind of business this was other than it was doing business as... It's a governmental function, Your Honor, and there's no question about it. Fire service training is a governmental function. For their firefighters? When we expand that beyond our own fire department, how does it become a governmental function? Because I'm sure there's volunteer firemen that are trained there also. Sure, but they're still performing a governmental function, which is fire service training. So any firefighter's government function. If they're performing a firefighting service, yes. So we can train other agencies and still be. You can. And by the way, they were also training Village of Romeo employees as well. It just so happened this class had non-Romeo employees. But the purpose in setting up this fire academy was to train Romeo firefighters, paramedics, and public works employees. And others. In the fire, in the activities.  As firefighters, but others, not just Romeo, though. Not just Romeo, though. That is correct. Yeah, no, absolutely. No, they were training other agencies. Absolutely, yes. So where does, this is clearly a government function, and that's, you don't need to answer any further. Well, no, it's a governmental function that is owned, controlled, and operated by a public entity. I think that counsel is mixing apples and oranges here. By the way, the sole defendant in this case is the Village of Romeoville. They are a municipality. This is the sole defendant. The fire academy is not a defendant in this case. It's the Village of Romeoville. The plaintiff admitted in responding to summary judgment that the fire academy is owned and operated by the Village of Romeoville. Run through and operated through the fire department of the Village of Romeoville. All the training occurred on fire stations owned and operated by the Village of Romeoville. That is the test for whether community is triggered. Doesn't it still have to be a governmental function? It still has to be a governmental function, which, of course, it is. And there's nothing in the case, lawyer, that says it has to be a governmental function solely for the Village of Romeoville. What's your best case on that? I apologize, counsel. I know you have a case. No, I'm trying to think of a case. I know that the case that seemed to me to be the most on point, it may not be directly answering your question, is the Corral v. Chicago Park District case. And that involves someone who slipped and fell on a sidewalk within the Lincoln Park Zoo. Now, of course, the Lincoln Park Zoo charges fees to anybody to come to the zoo, and they use those fees to run their operation. The test that the appellate court in Corral applied was whether the property was owned, operated, and controlled by a local public entity, which, of course, it was. And the court specifically said there it didn't make a difference that the park district was viewed as operating a proprietary type of activity, because that distinction is not made in the Tort Immunity Act. That distinction between whether it's a governmental function and a proprietary function had been abandoned by the courts years ago, decades ago. That was a common law distinction that did not find its way into the Illinois Tort Immunity Act. And, therefore, and I know I cited a case in the brief that says this. Actually, it says it in the Corral case, that that distinction had been eliminated when the Tort Immunity Act was passed. So the fact that the village of Romayville is running their operation, the fire academy, based upon fees charged to non-Romayville firefighters, is completely immaterial to whether or not the Tort Immunity Act applies. Ron, did I answer your question? Yes, and you found the case that I was recalling. Yeah, it was the Corral case. The zoo case. It jogged my memory, because Corral did talk about that distinction between governmental and proprietary, and that distinction no longer exists in applying the Tort Immunity Act. I wanted to make maybe a final point as to counsel's argument that somehow all the decisions have to be made by one single person. There's no case that says that. I don't think counsel said that either. He said that it would go down the line, didn't he? Well, I think he's made the argument in his briefing, at least, that all the decisions have to be made by one single person, and that's not the case. So if I misheard his argument here, but I know in his briefing he made that argument. There's no case that says that. You could have discretion or immunity apply depending on the activity being performed or the decision being made applied to several individuals within the scope of the activity. Your Honor, I think that obviously you don't get to the Wolfram One question unless you reject immunity, and as it relates to Wolfram One, if I can just address that really briefly in the case here. The case was very clear based on Barr v. Cunningham that so long as there are reasonable precautions already being taken by the local public entity or the employee, the fact that there aren't additional safety precautions being taken is not evidence of Wolfram One. Wolfram One would be an utter indifference to or conscious disregard for safety. So here, there was a very robust safety system that was utilized by the instructors here. A rope system, harnesses, anchors, instructions. By the way, I disagree with counsel's memory of the record here. There were instructions. Mr. Hidalgo admitted in his deposition that he was provided instructions on how to do the drill coming out the window, and there was another firefighter waiting in line behind him that also said that those instructions, detailed instructions were given to Mr. Hidalgo before he went out the window. But all that was provided. There was a robust system provided. The fact that there wasn't something additional done safety-wise is not evidence of Wolfram One conduct. In the case law, the Supreme Court case in Barr v. Cunningham, and a few decisions from this court stand for that proposition. No questions.  Thank you, counsel. Thank you. Thank you. Thank you, counsel. Mr. Karyanis, you may respond. Good morning again, Mario Karyanis, on behalf of the plaintiff appellant, George Hidalgo. In regards to the questions asked of Mr. Bersani regarding the private entity issue, Carol v. Paddock indicated that the test is whether the entity pursued activities that benefit the community at large and conducts the business of government. That's on page 25 to 26 of that decision. Brugger, which followed Carol, indicated that the entity seeking to avail itself of tort immunity protections must establish it pursues activities that benefit the community without limitation. That's at page 445 of that decision. That second case you just said, counsel. Brugger, B-R-U-G-G-E-R.  202 A.L.S. 2nd, 435. The question on that issue in this case is what benefit do Romeo Ville citizens, the community, get from George Hidalgo, at this point, as a firefighter doing classes at the Romeo Ville Academy? None. So the question is, again, understand tort immunity is a defense they have to prove. Under the two Supreme Court cases I just cited, there is absolutely a question upon which 12 jurors could find that they did not conduct themselves like a governmental body. There is a basis to find that they can't prove their defense, and George Hidalgo deserves a chance to try to convince a jury of that. In terms of the training that counsel just referred to, the training he's referring to is George hanging out the window being told as he's going down what to do. That's the training that he testified occurred. All of the firefighters, as I recall, from the various fire departments, agreed that there was no training prior to the drill happening. So there's a question based on the record as to whether the training was appropriate. Mr. Bersani talks about Mr. Kalaga. Mr. Kalaga is like the shop teacher, the mayor, the department of works person in these other cases we talk about, and I by no means am suggesting that there's like a one-headed monster that is appropriate here. Other people? Counsel, how do you respond to the fact that I understand what you're saying, that you didn't, and that's why I asked Mr. Bersani that question, but he is arguing that Kalaga's overall plan, what happened today or what happened in this case, fit within that plan. Even though the extra belt and suspenders approach was also in that plan, so was the let's try it like it's real, like it's a live drill. Kalaga's testimony was that trainees were to be told that the Class III harness was available if they wanted to use it. Aren't the facts that they were told they could use it even in the afternoon? Not in Hidalgo's case. My recollection is almost without fail. I think there was one person that testified that he recalls thinking that they were told. I believe the firefighters from the planes, Mr. Hidalgo, all have testified that they were not told. So at least contradictory testimony. I know there was some testimony that they were available. Right. So that was one thing. Kalaga testified that over the course of time they had been using the harnesses, the Class III harnesses, roughly a third of the trainees before that day had used the Class III harnesses, again, given an option to do it. An interesting thing that hasn't been talked about yet is that the Academy had a prior fall. They should have learned from that fall. They didn't. It was a different type of belt, but they had a prior fall, and Kalaga is the guy running the Academy, should have learned from that and done what he did after this case, which is instituted Class III harnesses in all cases without fail. But my point as to Kalaga is, yes, he set forth a guideline. They didn't follow it. I mean, the discussion that Mr. Bersani just conveyed as to how they hooked up the belt is not what the evidence shows. The D-ring slides around to the back. The ring you're supposed to hook them up to is affixed in the front. Mr. Yates, the belt manufacturer, told us that. They affixed the belay line, the one that's supposed to be the safety line, to that ring in the front. They affixed the main line, the one that holds his weight, to the one that goes from the back to the front. So they actually got it backwards. So they didn't use this great system that Mr. Kalaga set up. They actually did something that caused that line to come forward and get tangled with the other line, which probably caused the disaster that occurred in this case. And so it's our position, respectfully, that Kalaga set forth a system. There is nothing in the statutes or whatever that really dictates exactly how it needs to be set forth. But the instructors who ran the drill failed to adhere to a system, and George deserves a chance to try to convince the jury that that happened. And if he can't convince a jury that that happened, there is sufficient evidence in this case upon which a jury could find that an utter indifference for his safety occurred here and caused a catastrophic incident. I have nothing further. I see that I'm out of time. Any other questions? No. Nothing further. Thank you, counsel. Thank you, counsel, both, for your arguments on this matter this morning. It will be taken under advisement, and a written disposition shall issue.